# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| AUTOMATED CREEL SYSTEMS, INC., a Georgia Corporation, | |
| Plaintiff, | **CIVIL ACTION NO.:** |
| v. | |
| SHAW INDUSTRIES GROUP, INC., a Georgia Corporation, | **JURY TRIAL DEMANDED** |
| Defendant. | |

## COMPLAINT

Plaintiff, AUTOMATED CREEL SYSTEMS, INC., a Georgia corporation, by and through the undersigned, hereby files this Amended Complaint for Willful Patent Infringement against SHAW INDUSTRIES GROUP, INC., a Georgia Corporation, and, in so doing, states as follows:

### JURISDICTION, VENUE AND THE PARTIES

1.     This is an action brought pursuant to the Patent Laws of the United States, 35 U.S.C. §§ 271, *et. seq*.

2.     This Court has original jurisdiction pursuant to Title 28, United States Code, Section 1331, as this case involves a federal question arising under the Constitution, laws or treaties of the United States.

3.     At all times material hereto, AUTOMATED CREEL SYSTEMS, INC., a Georgia corporation (hereinafter "AUTOMATED CREEL"), had and has its principle address located in Fulton County, Georgia.

4.     At all times material hereto, SHAW INDUSTRIES GROUP, INC., a Georgia Corporation (hereinafter "SHAW INDUSTRIES"), has and had its principal address located in Whitfield Country Georgia.

5.     This action arises as a result of the infringing conduct of SHAW INDUSTRIES, which implicates interstate commerce.

6.     Venue is proper in the Northern District of Georgia pursuant to Title 28, United States Code, Section 1391(b) and (c) as Defendant "resides" in this judicial district, as the term "reside" is interpreted under Chapter 87, United States Code, and because a substantial part of the events giving rise to the infringement claims at issue occurred within this judicial district.  Venue is also appropriate pursuant to Title 28, United States Code, Section 1400(b), which provides, in part, that "[a]ny civil action for patent infringement may be brought in the judicial district where the defendant resides".

7.     All conditions precedent have been met, waived, or satisfied to bring this lawsuit.

## GENERAL ALLEGATIONS

8.     AUTOMATED CREEL, through its related entities, was founded in 1967 by F.R. Chadwick III as Southern Monorail Company and has at all times been engaged in the manufacture and service of overhead material handling equipment with its main customer base being textile manufacturers.

9.     F.R. Chadwick III turned over AUTOMATED CREEL to his son, David Chadwick, in 2004, who is now the President of AUTOMATED CREEL.

10.     Among the equipment manufactured by AUTOMATED CREEL are creels and their related parts.

11.     Essentially, a creel is a frame which holds bobbins or threaded strands of material which are put into a machine that makes fabric, textiles, wire, tires, etc., and it is used in multiple different industries.

12.     SHAW INDUSTRIES is a manufacturer of carpets and regularly uses creels in its manufacturing process.

13.     In 2004, David Chadwick allowed SHAW INDUSTRIES to inspect a creel that AUTOMATED CREEL developed and manufactured for another company.

14.     After the inspection, SHAW INDUSTRIES purchased three creels from AUTOMATED CREEL, all of which were delivered in 2005.

15.     As of 2005, the creeling operation in carpet had remained largely unchanged since the early 1970's, and the industry was plagued by worker injuries. In systems utilizing manual loading methods, a typical package of yarn weighed between 8 to 14 pounds.  In a given shift, a textile worker tasked with loading and maintaining the creel in a conventional process will lift, transport, and manipulate as much as six thousand pounds of packaged materials.  Because the package supports are arrayed at varying heights and distances from the delivery platform, the typical laborer is subjected to significant risk of muscular-skeletal injuries presented at each step of the yarn package replacement process.  As such, Mr. Chadwick recognized there was an opportunity to make the process safer and increase production.

16.     One product line that AUTOMATED CREEL developed to make the creeling process safer and to increase production was its big tufting machine creel which moves yarn to allow for mechanical loading rather than having laborers move the yarn to the creel for manual loading as had been the industry norm.

17.     Thereafter, AUTOMATED CREEL developed a patented product it called its "rotator" which completely eliminated the need for laborers to pull a pin which had previously been required in creeling operations and which laborers had been repetitively pulling up to 2,400 times a day.

18.    AUTOMATED CREEL spent years researching creels in applications outside the carpet industry.  These included creels in towel plants, sheeting plants, belting plants, nylon plants, tire cord plants, and more.  Each of these industries shared the same problems present in the carpet industry.  That is, massive amounts of labor and massive amounts of injuries, mainly, Carpal Tunnel and shoulder injuries.  Small package sizes required frequent reload and handling and all the packages were double (if not triple) handled, which increased labor costs.  The problem was how to deliver large amounts of yarn in larger package sizes using automated handling devices to pick up the yarn.  If this could be done, injuries would be eliminated while at the same time increasing the efficiency of the previous process machinery.  Therefore, one of the goals was allowing the operator in the previous manufacturing process to load the creel in larger increments per handle without giving him any additional work.

19.    Since  AUTOMATED  CREEL'S  first  contract  with  SHAW INDUSTRIES,  and  during  the  development  of  Plaintiffs  new  products, AUTOMATED CREEL continuously and aggressively marketed their products and services to SHAW INDUSTRIES.

20.    Finally, David Chadwick, invented and developed a revolutionary cart-to-cart  yarn  supply  system  and  method  which  would  (1)  allow  creels  to  run

continuously without needing to be stopped each time new packages of material were fed into the creel; (2) eliminate all moving parts; (3) use packages that are lighter that previously used packages; (4) allow for loading away from the running process and with machine assistance; (5) provide a machine that is significantly easier for workers to access and thread; (6) significantly reduce the possibility of the operator becoming entangled by the thread; (7) eliminate the possibility of threads becoming entangled with other threads as the packages unwound and were sequentially fed into the machine; and (8) eliminate the need to use an air compressor and perform complex tasks with an operator's fingers to force thread through long tubes each time a strand of yarn breaks.

21.     Mr. Chadwick met with SHAW INDUSTRIES on September 14, 2007 and presented them with his new designs.

22.     At that September 14, 2007 meeting, SHAW INDUSTRIES did request to keep a copy of Mr. Chadwick's drawings, but Mr. Chadwick declined the request.

23.     By early December 2007, AUTOMATED CREEL had a functional prototype of the cart-to-cart transfer system.

24.     SHAW INDUSTRIES visited AUTOMATED CREEL'S facilities on December 13, 2007 to inspect the prototype.

25.     At that meeting, Brent Boatwright of SHAW INDUSTRIES began

taking pictures on his mobile phone of the cart-to-cart transfer system.

26.     Thereafter, on January 17, 2008, AUTOMATED CREEL sent an e-mail to SHAW INDUSTRIES referencing the pictures taken by Mr. Boatwright and expressly notifying SHAW INDUSTRIES that the system was a proprietary product and that a patent application had been filed for the system.  A copy of said e-mail is attached hereto as **Exhibit "A"**.

27.     AUTOMATED CREEL continued to work on the prototype over the next several months.

28.     AUTOMATED CREEL again met with SHAW INDUSTRIES at AUTOMATED CREEL'S facilities on April 17, 2008.

29.     At the April 17, 2008 meeting, AUTOMATED CREEL agreed to allow SHAW INDUSTRIES to test the prototype for 30 days.

30.     Mr. Chadwick took three carts and two transfer tables to SHAW INDUSTRIES'S Plant Number 6 on May 5, 2008.

31.     On May 6, 2008, SHAW INDUSTRIES sent AUTOMATED CREEL an e-mail advising that, "The creels are still looking good." and requesting pricing information.  A copy of said e-mail is attached hereto as **Exhibit "B"**.

32.     After receiving the pricing information, SHAW INDUSTRIES again sent an e-mail on May 19, 2008 continuing to advise that the creel was working

successfully.  A copy of said e-mail is attached hereto as **Exhibit "C"**.

33.   Through May 2008, SHAW INDUSTRIES and AUTOMATED CREEL continued to communicate regarding the size of the equipment.

34.   Mr. Chadwick last met with SHAW INDUSTRIES on May 21, 2008 regarding the equipment.

35.   At that May 21, 2008 meeting, SHAW INDUSTRIES demanded that AUTOMATED CREEL execute a Mutual Confidentiality Agreement before discussing the patented system any further.

36.   On June 10, 2008, AUTOMATED CREEL advised SHAW INDUSTRIES that it would not execute the Mutual Confidentiality Agreement proposed by SHAW INDUSTRIES.

37.   AUTOMATED CREEL thereafter removed its prototype from SHAW INDUSTRIES' facilities.

38.   On October 5, 2010, the United States of America issued the patent over Mr. Chadwick's invention under United States Patent No. 7,806,360 ("the '360 Patent").  A copy of the '360 Patent is attached hereto as **Exhibit "D"**.

39.   Since removing the prototype from SHAW INDUSTRIES' facilities, AUTOMATED CREEL has developed a firm belief that SHAW INDUSTRIES has built the system described by the '360 Patent and that SHAW INDUSTRIES

regularly uses the patented technology to manufacture the carpet it sells throughout the United States and worldwide.

40.    AUTOMATED CREEL has sent a cease and desist letter to SHAW INDUSTRIES, inspected their manufacturing facilities and confirmed that SHAW INDUSTRIES does in fact infringe on Plaintiff's patent.  A copy of said cease and desist letter (without attachments) is attached hereto as **Exhibit "E"**.

41.    Despite the above, AUTOMATED CREEL has been unable to convince SHAW INDUSTRIES to cease its infringing conduct.

THE INITIAL COMPLAINT

42.    AUTOMATED CREEL filed its initial Complaint for Willful Patent Infringement with this Court on February 8, 2012.  [Dkt. No. 1].

43.    Following approximately seven months of litigation, it was subsequently discovered that the '360 Patent had not been formally assigned by a proper written instrument to AUTOMATED CREEL.  SHAW INDUSTRIES thus asserted that AUTOMATED CREEL was without standing to pursue the litigation.

44.    The parties thus filed a Joint Stipulation for Voluntary Dismissal, *without prejudice*, on October 19, 2012 [Dkt. No. 50], which was entered by this Court on that same day [Dkt. No. 51].

45.    To cure the asserted standing defect, on that same day a corrected

assignment was executed between David Chadwick, the assignor of the '360 Patent, and AUTOMATED CREEL, the assignee of the '360 Patent. *See* [**Exhibit "F"**, a copy of the aforesaid October 19, 2012 assignment]. Said assignment was immediately forwarded to the United States Patent and Trademark Office, and was ultimately recorded on October 29, 2012. *See* [**Exhibit "G",** USPTO printout showing recording status of the October 29, 2012 assignment].

46.     Before the instant amended complaint could be filed, however, SHAW INDUSTRIES filed a first petition for *Inter Partes* Review of the '360 Patent, which sought to invalidate said patent. Review of this first petition was granted and initiated by the Patent Trial and Appeal Board (PTAB) as to claims 1-3 and 5-21 of the '360 Patent. SHAW INDUSTRIES later filed a second petition for *Inter Partes* Review of the '360 Patent, which sought to invalidate claim 4 of said patent; review of this additional petition was also granted by the PTAB.

47.     On December 30, 2016, following four years of litigating the validity issues raised by SHAW INDUSTRIES before the PTAB, which included an appeal to the Federal Circuit Court of Appeal, a Decision on Remand was issued by the PTAB declaring claims 6, 7, 13, 15-18, and 21 of the '360 Patent valid. *See* [**Exhibit "H"**, Decision on Remand]. To date, however, the Director of the USPTO has not yet issued a Certificate confirming the validity of the claims determined to be

patentable by the PTAB, as required by 35 U.S.C. §318.

48.     However, in consideration of the time that has passed since the Decision on Remand, AUTOMATED CREEL must seek judicial relief of the ongoing infringement that is occurring.

49.     As such, AUTOMATED CREEL has been required to continue its retention of the undersigned counsel to pursue its interests in this matter, and is obligated to pay the undersigned a reasonable attorneys' fee for their services, and to reimburse the undersigned for any costs incurred in connection with said representation.

## COUNT I:
## PERMANENT INJUNCTIVE RELIEF

50.     Plaintiff re-alleges and re-avers paragraphs one (1) through forty-nine (49) as if fully set forth herein.

51.     This is an action for permanent injunctive relief pursuant to Title 35, United States Code, Section 283, of the United States Patent Act.

52.     Said section provides that this Court may "grant injunctions in accordance with the principles of equity to prevent the violations of any right secured by patent, on such terms as the court deems reasonable."

53.     As alluded to in more detail above, SHAW INDUSTRIES has infringed, and continues to infringe, on the '360 Patent.

54.     Despite repeated demands, SHAW INDUSTRIES continues to infringe the claims of the '360 Patent.

55.     Such refusal to honor Plaintiff's exclusive patent rights has caused, and will continue to cause, irreparable harm. Each day that Plaintiff is deprived of its earned intellectual property rights causes irreparable injury.

56.     Plaintiff has no adequate remedy at law, especially because the property at issue is intellectual property and patented work that is being deprived.

57.     There is no remedy at law that can fully compensate Plaintiff for the deprivation of said patent rights, and, in light of the facts of this case, there is a substantial likelihood that Plaintiff will succeed on the merits of the instant case.

WHEREFORE, Plaintiff AUTOMATED CREEL SYSTEMS OF AMERICA, INC., a Georgia corporation, by and through the undersigned, hereby respectfully requests that the Court enter a permanent injunction enjoining Defendant SHAW INDUSTRIES GROUP, INC., a Georgia Corporation, and all those in active concert and participation with SHAW INDUSTRIES GROUP, INC., from using, making, selling, marketing, distributing, transferring, or otherwise infringing on the claims of the '360 Patent as more fully set forth above, together with costs, attorneys' fees, and such other and further relief as this Court deems just

and proper.

## COUNT II:
## WILLFUL PATENT INFRINGEMENT

58.    Plaintiff re-alleges and re-avers paragraphs through forty-nine (49) as if fully set forth herein.

59.    This is an action for patent infringement pursuant to Title 35, United States Code, Section 271, of the United States Patent Act.

60.    As more fully set forth above, SHAW INDUSTRIES has infringed, and continues to infringe, the claims of the '360 Patent by, *at least*, making and using infringing technology.

61.    All such infringing conduct of SHAW INDUSTRIES has occurred and was committed by SHAW INDUSTRIES in a willful manner, irrespective of and despite repeated demands that SHAW INDUSTRIES immediately cease its infringing conduct and recognize the rights under the '360 Patent.

62.    SHAW INDUSTRIES' actions have been committed and performed in a willful, knowing and bad faith manner.

63.    SHAW INDUSTRIES' actions have caused, and continue to cause, irreparable harm to Plaintiff to which there is no adequate remedy at law.

WHEREFORE,   Plaintiff   AUTOMATED   CREEL   SYSTEMS   OF

AMERICA, INC., a Georgia corporation, by and through the undersigned, hereby respectfully demands judgment against Defendant SHAW INDUSTRIES GROUP, INC., a Georgia Corporation, for the full amount of damages sustained, including, but not limited to, any and all remedies available pursuant to the Patent Laws of the United States, 35 U.S.C. §§ 271, *et. seq.*, which include, but are not limited to, no less than a reasonable royalty award, lost profits, treble damages, costs, pre and post judgment interest at the maximum allowable rate, attorneys' fees, and such other and further relief this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff AUTOMATED CREEL SYSTEMS OF AMERICA, INC., a Georgia corporation, hereby demands trial by jury of all issues so triable as a matter of law.

**Dated this 21st day of March, 2018.**

Respectfully Submitted,

| | |
|---|---|
| /s/ Alexander D. Brown<br>ALEXANDER D. BROWN, ESQ.<br>GA. BAR NO. 902761<br>abrown@conceptlaw.com<br>SCOTT D. SMILEY, ESQ.<br>FLA. BAR. NO. 678341 | PETER G. HERMAN, ESQ.<br>FLA. BAR. NO. 353991<br>*Pro hac vice to be filed*<br>pgh@thlglaw.com<br>Peter Herman, P.A. |

| | |
|---|---|
| *Pro hac vice to be filed*<br>scott@conceptlaw.com<br>ADAM S. GOLDMAN, ESQ.<br>Fla. Bar. No. 86761<br>agoldman@conceptlaw.com<br>THE CONCEPT LAW GROUP, P.A.<br>6400 N. Andrews Ave., Suite 500<br>Fort Lauderdale, Florida 33309<br>Tel: 754.300.1500; Fax: 754.300.1501<br><br>*Counsel for Plaintiff* | 3020 NE 32nd Ave, Ste 226<br>Ft. Lauderdale, Florida 33308<br>Tel: 954.315.4874; Fax: 954.762.2554<br><br>*Co-Counsel for Plaintiff* |

## CERTIFICATE OF SERVICE

Inasmuch as the undersigned is aware that Defendant Shaw Industries, Inc. is represented by Thad Kodish, Esq. (tkodish@fr.com) and Erin Alper, Esq. (alper@fr.com), of Fish & Richardson, P.C., 1180 Peachtree Street, N.E., Atlanta, Georgia, 30309, I hereby certify that on this **21st day of March, 2018**, e-mailed copies of the foregoing Complaint (with its exhibits) was delivered to said counsel upon its filing.

/s/ Alexander D. Brown
ALEXANDER D. BROWN, ESQ.
THE CONCEPT LAW GROUP, P.A.
6400 N. Andrews Ave., Suite 500
Fort Lauderdale, Florida 33309